for the first time this week. Thank you, Your Honor. My name is Brian Leslie, and I represent Mr. Moore. It is my intention now to reserve three minutes for rebuttal, depending on whether I need someone to help you, but please keep track of your own time. Thank you, Your Honor. The main thrust of the issue that I'd like to talk about is that we have three people walking down a street on the sidewalk doing nothing suspicious, approaching no vehicles, dressed appropriately for the weather, in the direction of a 7-Eleven store that's open at the hour that they're traveling to do business with people who might be out and about at that time, who are pulled over by an officer who has no particularized suspicion relative to them. You don't dispute that he had reasonable suspicion to believe that there was criminal activity afoot with regard to car prowls in the vicinity? I do not dispute that. I think in fact... So there were potential crimes in progress that he was investigating? Yes, and in fact, I think that when we talk about the cases that defer to the officer's experience and expertise, certainly the officer is entitled to make that judgment based on what the officer is observing. But at 4 o'clock in the morning and nobody else is around? Your Honor, the response to that is somebody must be around at 4 o'clock in order for the 7-Eleven to be open at that hour, because the 7-Eleven... Or for cars to get burglarized, one or the other. This is two blocks from a street at which it's kind of entering the business district of Springfield. And this is discussed in the records, that on the road they're traveling, which is 14th, it goes by a hospital that's kind of a business district, then it passes through some residential neighborhoods, and then when it gets to Main Street, which is two blocks, or actually a block and a half from where they're stopped, it's a business district again, and the 7-Eleven is part of that business district. And so I don't agree with the assessment that 4 o'clock in the morning is an unusual time for people to be out and about on that street and in that district. Well, that's what the officer testified to, and that's what the district court found as a matter of fact in determining whether or not he could articulate reasons as to why he wanted to shake down your clients. So what do we do with the factual finding in support of the district court's ruling that there were articulable reasons to stop and inquire of your client as to what he was doing in the neighborhood at that hour? There are actually three responses to that question. First, I believe the officer's testimony is that in the neighborhoods where he was patrolling, he saw no other people. But he stopped these people as soon as he came out onto 14th, which is the main thoroughfare, and as soon as he got within range of the business district. So I don't believe the officer said or the court found that there was nobody out and about in that area. I think the testimony was that there was nobody in the neighborhoods. Well, the officer testified that he didn't see anybody else on the street and that no cars passed him during the period of time that he was patrolling and looking into the car prowl. So I don't understand how you can make that argument factually. You haven't got any evidence in the record to support what you just said. I think I do. I think the officer's testimony about not seeing any other cars about during the time that he's exploring the car clouds is because his testimony was also that he was back in these residential neighborhoods at 16th and G and the 1700 block of, I forgot, I think it was H, and then as he came down by my memory. Mr. Leslie, I think your argument would make a whole lot more sense if this had occurred as in Brown versus Texas at 1245 in the afternoon. But as Judge Readley points out with his question, this is 4 o'clock in the morning, and these are the only people on the street in a vicinity where hot car prowls are in progress. Wouldn't it have been derelict in the officer's duty not to stop and inquire of these people as to whether they might possibly be involved in the criminal activity that he was investigating? Not only do I not think it was derelict, but I think it was a violation of their Fourth Amendment rights. I think that no case, none, says that it's okay to stop people at 4 o'clock in the morning just because they're the only people out and about that you haven't seen. What do we know about the direction in which they were walking? As I read the briefs here, there seems to be some different characterization. Tell me what we know from the record as to the direction that these people were walking when the officer first saw them and then when the officer stopped them. I'm looking at the map that I put in my opening brief at page 5. That's a blown-up version of the meaty area. The bigger map is page 4. What page are we on for this one? Page 5 of my opening brief. The officer has highlighted in that picture the area where he patrolled, and north is at the top of this map. And so the area of 14th and B is the last place he reached in his patrols. So as I said a moment ago, he'd been patrolling the neighborhoods, and he hadn't seen anybody back there. What the officer testified, and this is at the excerpts of record at pages 172 and 173, is that he was coming from basically the 1500 block of B, which is east of B. There's no 15th, but it's halfway between 14th and 16th. So he was driving between 16th and 14th on B Street. Yes. He says that he saw the three people rounding the southwest corner of that street. And then heading south on 14th. So he saw them coming toward him on B. And then they turned south on 14th. I believe his actual testimony was that he saw them rounding that corner. So they were actually heading south on B Street when he first saw them. Isn't that what he testified? I believe his testimony was that he saw them rounding that southwest corner of that intersection. So they were somewhere in the arc of the turn? Is that how we're to interpret that testimony? That's certainly what my interpretation of that testimony was. Rounding the corner. Your inference is that they're coming toward him on B, and then they're rounding the corner to go south. They were actually going south on 14th when he made the stop. I take it the actual stop occurred on 14th Street on the lawn of the church that's shown on that map. Is that right? I hadn't recalled that it was on the lawn of the church. That's what I read in the records when your client started backing up that he was actually backing onto the lawn of the church. Let me make sure. If it is right that they were coming toward him on B and then turning south onto 14th, as they were coming toward him on B, they were walking toward the area of the criminal activity rather than away. Is that correct? Yes.  We also have Ms. Harris' testimony. She says they were on B and turned onto 14th, and the officer was on the opposite side of the street up around the 1500 block. So Ms. Harris also, to the extent you can intimate anything, is saying it was the opposite direction. But the additional point I would make on that is it's the government's burden to establish reasonable cause. You've got two and a half left.  Thank you, Your Honor. Before I go, let me ask one question with regard to direction of travel. Would that turn have been consistent, assuming that the officer was correct that these people might be involved in the car clouds, with the fact that they could have been walking westbound on 14th Street, crossed over the street just past the intersection of 14th, made a U-turn to the other side of the street to look at cars on that side, and then turned south on 14th Street because they saw the police car with its lights off coming down the block? It is not. Would that be consistent with what the evidence shows? No, it would not, because Ms. Harris never said that they saw the officer before they made the turn, before they. . . But there's no testimony to that. Well, I agree there's no testimony to that, and so I suppose. . . So it's hypothetically possible that that might have happened, based on what we know of their position at the time the officer first observed them. Well, there are any number of hypothetical possibilities. So is the answer yes, that it's hypothetically possible? Yes, the answer is that it's hypothetically possible. The further answer, though, as I said, is that it's the government's burden of proof, and they haven't established that. Well, let me take my time and not take any more of yours, but you can answer this when you get back up if you think it worth it.  We don't know anything from the officer's point of view about how the defendants were walking when the defendants saw the officers. Now, that may have been when they were headed in the other direction. It may have been when they'd already gotten to the corner, but we don't know actually anything about how they were walking or what direction they were walking in when they first saw the officer's patrol car down the way. So I don't see this direction as significant one way or the other, counsel. Now, you can respond to that when you get back up. Thank you. Mr. Pavagni. Good morning, Your Honor. The question regarding the reasonableness of the officer's belief that there's criminal activity afoot has already been established. Well, it's evidence that there was criminal activity in the neighborhood, but I think Mr. Leslie's point is, is there a nexus between the crimes that he's investigating and whether or not these people are connected to it? In other words, a particularized or objective view by the officer that these three individuals are the ones who are involved in it. And you agree that our case law requires that, do you not? Oh, yes. It's a two-step process. One is the officer has to think something is amiss criminally, and based on specific facts, we have those here conceded. And then the next step, if you will, the next item we have to take a look at is a particularized focus on the individuals the officer believes, has reasonable suspicion to believe is involved. Here, I think the court's already touched upon much of what I'm going to say, which is at 4 in the morning, and as you go through the officer's testimony, Officer Weaver, who's patrolling this particular area for the reasons given, and we're not just simply saying it's a high-crime area. We're saying there's a particularized reason why he's looking in that area, and that's because of car clouds and some drug activity. Mr. Leslie cites the transcript at page 172. I go back a little further. I go back to page 147, and although, as has been pointed out, maybe what the people were doing when they may have seen the officer's car, we don't know. We do know, Judge, however, that the officer had his lights out. So he's driving around in a patrol car without his lights on. Not any lights. Not any lights. What he does, and he talks about that. He says it's been his experience when you're in an area investigating late at night, that if you have your lights on, people might notice you, especially if it's the police cruisers. So that might help you a little bit in your question. But page 147, when we're not doing that. But that makes it less likely rather than more likely that they would have seen him prior to the time he comes up. It makes it less likely they would have seen him. Correct. So he's in stealth mode. Well, he's trying to be. Is it so dark they can't see a car? That I can't answer, Judge. It's 4 in the morning. Springfield, you probably have some street lights out there. That particular area is a residential area. A lot of cars on the streets. I don't know the answer to that one. I can tell you that page 147, though, when you're asking about the direction the officer thought they were walking, you've got to actually go two steps back. One, if you look at the transcript, just before the officer even sees these people, radios are actually e-mails. It's kind of neat nowadays. They've got these computers that you can actually e-mail each other. And he's telling his colleague, his other officer, I think there's four or five patrolling around that night, that on page 140, he says, this is before he sees anybody, he says, Hey, jerk, it looks like they went down 16th and west on B Street. So even before he sees anybody, that's what the officer thinks these people are doing. That's how he's following the trail or path that he's going after. And how did he conclude that? On page 140, it's the officer's writing to another officer using the language I've quoted for you. Is it the freshness or the marks on the window? That's right. The condensation's been wiped off. There's no new condensation. So the officer feels he's... Can he determine the direction of travel by the difference in the condensation? Are we that precise about it?  What the officer's doing... What page are you on when he says that? Page 140 of the excerpt of the record that Mr. Leslie has provided, page 22 of the transcript. Okay, where are we on there? Lines 10 and 11 through 12. Short time later, at 3.58, I said, I wrote to Officer Myers, Hey, jerk, it looks like they went down 16th and west on... I understand that, but you're telling me that he's determining this by the freshness of the condensation. Correct. But you don't have his testimony to that effect. You just have his conclusion here. That's correct. Is there anything in the record that tells us the basis for the conclusion? Yes, because if you go back, what you're doing is you're seeing he's kind of following a path as he's going... Well, I understand he's following a path, but how does he know that it's gone this way instead of that way? Because the last car he looks at is this Honda that's been opened. But how does he know that that's the last in the sequence? In other words, do you wonder if it's the other way around? Yeah. All I can tell you is that that's his conclusion based upon his observations at the time and his experience. He doesn't explain that. He does not explain it beyond the fact that he's telling... In the briefs you talk about this condensation, but did he? Yeah. He just tells his fellow officer that's why it's going this direction because that's his suspicion. Well, the only thing he testified to was that it appeared the condensation had been wiped off and it had to be fresh because no new condensation had formed in the area where the sleeve had been wiped. Correct. That's as far as it goes. That's as far as it goes. First, I think at 16th and G, it's some wiping off the windows on the driver's side. Go a little further, there's a car open. Go a little further, a car's been opened and the glove box is open and some papers or doors left open. So we know he's following a trail, and he concludes he's following the trail in the direction people were traveling, but we don't have the basis for his conclusion as to why that was the direction instead of the other. Correct. But the significance of that becomes, as we know, is that then he comments on page 146, how many other people have you seen out there before you observe these three people that you've given us the names for? Zero. No other people are out. He says the same thing about the cars. Now, Mr. Leslie says that that makes sense because he's coming out of a neighborhood and that it makes sense he would start seeing people because 14th is a busy and traveled street. I don't know if I'd say it's a busy and traveled street. It's a more traveled area. More than the other. Correct. So Mr. Leslie says, and I want to get your response, that it's no surprise that he wouldn't have been seeing anybody back in the neighborhoods, and therefore, says Mr. Leslie, not that much of a surprise that he would have seen somebody when he gets out to 14th. Let's say it's less of a surprise. The point is, is when he gets to the corner, there's not anyone else around either. That's why he focuses on these three people. More importantly is that when he looks at the Honda and he looks down B Street and he calls it a brief, and page 147, it was just a brief moment. I got back in my car, this is after making the observations of the Honda, and started driving. Then I saw them. Yeah. So now we've got location, we've got time, and you put them together. We're not talking he's driving around for five more minutes and happens to come across these people on a fairly well-traveled, and that's probably an overstatement for in the morning, thoroughfare. And then he says they're only roughly a block and a block and a half away because there's no 15th Street on this particular neighborhood. And then I ask the question of him, and I do it twice. And it's on page 147 and page 148. Now looking at our map, and by the way, I have a little larger map on my excerpt because I also point out in yellow the areas that the cars had broken into before, and Ms. Harris says they started at 5th and Q Street, which puts them roughly, if you look at a triangulation, approximately the same distance from the other two break-ins that had occurred earlier in the preceding days. But my question is this. The car that I saw was basically in the middle between 14th and 16th. Now when you saw these three people, which direction were they walking? My question, were they walking towards these cars that you had just seen or walking away? No, they were walking southbound away from the cars. Question, and does that tell you something based upon your experience? And I go on. The answer from the officer, considering the condensation looked like it had recently been wiped, these three people were the only people out. The two men were wearing black, wearing gloves. That made me suspicious of them that they might have done this. What about the direction they were walking? So I'm trying to hone him in on this. They were walking away from it. People don't walk away towards crimes after they've done that. Then we go back to what Mr. Leslie says, which is page 172. We revisit the direction they're walking. So this is the same witness now on the cross. Same witness. Yes, it is on the cross. And the answer is? So now he's answering Mr. Leslie's questions and not yours.  Question by Mr. Leslie. When you saw Mr. Morney's companions, you said they were walking south on 14th, correct? Yes, they were rounding the corner at 14th and B heading south. So that's the first time we get rounding the corner. Correct. As Mr. Leslie's citations go on to say, he goes on to argue, but to point out, so either direction they could have gone on 14th, they would still have been away. So if they had gone north or south, they would have been away from where the officer was. The officer agrees with that. Then he goes down to the bottom of the page. And it would appear to me that it was on the southwest side of the corner, correct? That's correct. Now, southwest side of the corner puts them across the street. Now, the problem we have in this record, which I take partial blame is. I'm sorry, I've lost you. Where are you when it says southwest? Page 173, lines 16 through 24. Okay. And they're on the sidewalk. Now, part of the problem we have, if this is significant and you're finding a reasonable suspicion. Okay, I'm on page 173. Correct. Officer, read me the lines you're working on. Okay. Line 17, question by Mr. Leslie. And it would appear to me that that's on the southwest side of the corner, correct? Okay, I'm with you. The answer is that's correct. So they were on the side of 14th, away from where you were. The answer is that's correct. Okay. Now, the question that I don't ask that doesn't come out is. What side of the street on 14th is 711? Is it on the south side of 14th or is it on the north side of 14th? If it's on the south side, you'd have to cross 14th to get on that sidewalk to go south toward the 711. But if they were coming, if Mr. Leslie is correct. If they were coming from the east, then they would have had to cross the street if they were truly going to the 711. Correct. And so the answer is we don't have an answer. Do we know where the 711 is? No. Well, not on this record we don't. The trial judge might have known, right? Judge Aiken might have known being a Springfield native and having to practice law there, but that's not in the record. So we don't even know whether the 711 is in the direction they're traveling on 14th toward the south? I think I point out in my questioning, or if it's not, if it's in the map, but I'm confident it's in the record, that I established to the officer that there was a 711 open on Main Street and 14th at that time of night. On Main Street and 14th? And do we have a map to tell us? I think the better map is the one I gave you in my supplementary, except the record, because that was actually exhibit one that I provided to the court. And you'll see the red markings. I'm shuffling papers here. I want to see a map. I don't want a discussion. Look at my supplementary excerpt. Excerpt from 21. Okay, I've got the map. So where's the 711? Okay. The map that you have, if you're using Mr. Leslie's map, which is not color, you'll see Main Street's pretty bold, just below 14th. So if you're going south on 14th, you will intersect Main Street? Correct. And do we know whether the 711 is north or south? We do not from this record. But it's on Main Street? It is. And it was open, because I established that through my officer. So if you're headed down 14th Street, you're headed toward the 711. That is correct. You may turn right or you may turn left when you get to Main Street. We don't know. Okay. Correct. And so the final portion, since my time is out, since we seem to have focused on the issue of... Well, you know, we're interested in getting through this. So if you have things to say, let's say them. We're not going to cut you off. What you have is an officer who's on a trail, and he sees the three people, the only three people he sees out at 4 in the morning that are in the vicinity. And we're not talking a long distance. We're talking within a block and a half, two blocks if you want to use Mr. Leslie's argument. The timing is perfect with the condensation being wiped, the open doors, and they're wearing clothing that while may be innocent and appropriate for that time of night, as Mr. Leslie's pointed out, is also consistent with the officer having a reasonable suspicion that they're wearing dark clothing and wearing gloves. Now, putting this together in the officer's mind, given the path he has followed, given the circumstances of the neighborhood, and given what he has seen as the only people out, this provides a reasonable person, an objective basis, a reasonable officer in this situation, an objective basis to find that these people may have been involved in this criminal activity. And that's why he stops them. Here's my problem with your argument. I mean, I've got problems with both sides, but here's my problem with yours. If it's true, as the officer says, that when he first saw them, they were rounding the corner... Correct. ...and heading south on B, that strikes me as that means they're coming this way. That is to say, they're headed up B toward 14th, and he sees them as they're turning to go south on 14th. And if they were coming this direction, that is to say, toward him on B, they were walking toward the crimes the officer has just observed. Correct. But the officer himself testifies people don't, I'm now quoting the officer... Correct. ...in response to your question, people don't walk towards crimes after they've done them. Correct. Yet he's seeing them walking toward the crimes. No, he's not. It's his testimony as they were walking away from him. That's why I cited... Well, I'm sorry. His testimony is they're walking away from him on direct. His testimony on cross is they're rounding the corner. Now, once they're going south on 14th, they are walking away. Correct. But if they're coming up 14th toward him to round the corner... From the east. ...they are not walking away as they're coming up B. Correct. So... So, yeah, the situation is like coming from the east toward the officer who's coming from the west as he's following the path. And he says they're rounding the corner headed south on 14th. And that is the dispute that Mr. Leslie and I have had. Is that the key to the case? I don't think it is. I think the fact that they're at that corner and they're the only people around at that location given what the officer is seeing, and I choose to go into hypotheticals, but they're at the right location at the right time for what the officer has observed, so that's why he stopped. Let me do this one, then. Let's assume, and I understand that in your view there's some ambiguity of what's being said here. But let's assume that he sees them walking toward him on B. Okay. So they're unambiguously walking toward him on B. Correct. Two seconds later they reach the corner and they turn right and go down 14th. If we have it undisputed that when he first saw them they were walking toward him on B, do you still maintain it's a proper arrest? Yes. Okay. Because the officer had not gone across the street to see if any cars had been wiped off. Even though he himself says people don't walk toward crimes after they've committed them. Correct. That was a factor he was taking into consideration. Well, no, it's a flat statement. Now, it's a little rhetorical in a flourish, so I'm not going to skew it. No, it would be unusual, that's true. But it's not unheard of, as we know from the cases we've had. Sometimes criminals... Well, they could have been kind of wandering around the neighborhood and they come back and, you know, they just open out the door. And the importance there that I would like to finish up with is not the officer's testimony. It is that of Ms. Harris, and she had certainly a lot of baggage. She said they left 5th and Q and they were zigzagging. That's her testimony as to how they were walking. She also said she made it a point of walking in front of them, at least two men, because she didn't want to see what they were doing. So the zigzagging portion of it does not, if you will, hurt the government's case in that regard. Thank you. Thank you very much. Mr. Lesser. Judge Fletcher, I agree with most of what I've heard you say in the last several minutes. I would add... I've just been asking questions. I understand. And my answer is yes, I agree with that. I would add to it, however, that to the extent there is any silence in the record about where they were coming from or any ambiguity in the record, the runner wins in a tie. And that is to say the government bears the burden of proof. Is that just a factor that the district court and the officer have to consider in viewing the totality of the circumstances? You're arguing that it's a factor that detracts rather than enhances the finding of nexus between the car prowls and these people. Well, of course it's a factor in the sense that if... You're saying it's the determinative factor. I think it is here because there are no other factors. Well, what about the long coats and the black gloves? It's November 29th at 4 o'clock in the morning in Oregon and long coats and black gloves. But if you're involved in car prowling and you'd rather not be seen, wouldn't it be prudent to be going about your business dressed like a car prowler? Well, of course. But the problem is that you have Brown v. Texas and a whole host of cases that say that the particularized suspicion has to be narrow enough. It can't describe too many individuals. And long, dark coats with gloves on November 29th in Oregon at night describes too many individuals in order to support a particular suspicion. What was he doing with the coat unbuttoned? Excuse me? The coat unbuttoned and the shirt hanging over the... Your Honor, I don't know. It may be that in 30 degrees when he's walking that he warms up and decides to cool himself by unbuttoning. I don't know the answer to that. But that would suggest itself as one possible answer. I'd like... I know my time's up, but Judge Reveley asked me a question. No, no. This man wants to speak to you the same as the government. We'll hear what you have to say. Judge Reveley, if I understood your question correctly, it was what were these people doing when they first saw the officer or at least what does the record show them doing at that time? And since the record does not clearly establish when they first saw the officer, that's a difficult question to answer. However, when the officer first saw them, the officer described what they were doing. And it's several pages after page 173 of the excerpts. He saw them rounding the corner. He saw them walking down the sidewalk. And for the next several pages, we describe that even though he'd seen the windows wiped off on the driver's side of the car, which when you parallel park along the road, the driver's side is going to be toward the road rather than toward the sidewalk, he did not see them approach any cars. He did not see them engage in any furtive movements. He did not see them do anything other than walk down the sidewalk. And I think the evidence is the main equivalent. The fact that your client would not stop when commanded to do so by the officer as he jumped out of his car with the lights flashing. That's of no significance at all under Florida. The fact that he keeps walking when the police officer is trying to stop him. Absolutely. The officer can't consider that as a factor. He cannot. Florida versus Bostick, Florida versus Royer, a host of other cases say that failure to acquiesce to the officer's request is not a factor in the reasonable cause determination. You have Wardlow and you have Hodari-D that say flight is a factor. Well, the fact that he was walking rather than running doesn't necessarily mean he wasn't trying to flee, does it? Oh, absolutely. I mean, if a person is walking down the street. So he has to be running. Well, he has to engage in activity consistent with flight, such as hiding, perhaps. Or failing to heed the officer's command that he stopped. Failing to heed the officer's command is absolutely not a factor that can be considered. And if I can step back to my desk for a minute, I can even provide you with the page size. Well, I've read the cases. I don't necessarily agree with your characterization when we're looking at totality of the circumstance. Under Bostick and under Royer, they both say, and they're not the only cases that say it, that mere failure to abide by the officer's instruction stops. But it is a factor that may be considered with other factors. I'm sorry, Judge. That's not my read of the cases. It's an impermissible fact that the police officer may never consider the fact that the guy won't stop. That's your position. My position is that absent flight or hiding or some attempt to evade the officer, merely continuing on your way and not acquiescing to the officer's command is not a factor. Notwithstanding the fact that he's carrying throwing knives and a gun that he probably doesn't want the officer to find when he pats him down. Those may be the reasons why he continued, but they're not related to the officer's reasonable suspicion because the officer had no knowledge. The officer cited it as one of the reasons why he stopped him, didn't he? No. That's one of the factors. The officer didn't know about the throwing knives and the gun until the officer questioned him after stopping him. You're not challenging the officer's right for safety reasons to conduct the patting. I am not. We made that clear at the hearing. Once Mr. Moore was stopped and the officer had a right to ask him if he had weapons, Mr. Moore said he had some knives. From that point on, at the hearing, I stood up and I said, from this point forward, we have no contest. It's all related to what happened before that time. But I think that I've answered the questions that the panel has asked. Don't you think a holding that the refusal to stop could not be considered as a factor, even when combined with the other factors of 4 o'clock in the morning and the surrounding circumstances? Don't you think that holding would be inconsistent with the Supreme Court's repeated holdings that it is not a Fourth Amendment problem for officers to ask questions of citizens? Your Honor, let me get the quote that I have, because Rostick and Boyer, Bostick and Royer, are both Supreme Court decisions. And so, no, I don't believe it would be inconsistent with the Supreme Court's pronouncements taken as a whole. But there is a very specific quote in Bostick and another one in Royer that I cited in the brief. And it was in my reply brief in a rather lengthy footnote. And I urge the Court to refer to this. There was one question I think I've left unanswered, and I think it was part of one of Judge Tolman's questions, and that had to do with referring to the district court's findings. And I argue at some length in both briefs, the opening and reply briefs, that the district court in this case clearly considered evidence that the district court itself had excluded. And, in fact, it looks, frankly, the district judge and I probably have a different opinion on this, it looks, frankly, like every single one of her factual findings came from evidence that she explicitly excluded on the record. And so I don't believe the Court can defer to findings that she made because of the cases that I cite and the arguments that I make that you don't defer when the district court has considered inadmissible evidence. Okay. Thank you. We understand. Thank you very much. Very helpful argument on both sides. The case of United States v. Moore is now submitted for decision. The next case on our argument panel this morning is United States v. Ortiz Hernandez. Thank you.
judges: Reavley , W. Fletcher, Tallman